**E-Filed 6/15/2010**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| QUIA CORPORATION,<br><br>        Plaintiff/Counter-Defendant,<br><br>        v.<br><br>MATTEL, INC. and FISHER-PRICE, INC.,<br><br>        Defendants/Counter-Plaintiffs. | Case Number C 10-1902 JF (HRL)<br><br>ORDER[1] CONDITIONALLY DENYING MOTION FOR PRELIMINARY INJUNCTION<br><br>[RE: Dkt. No. 23] |

    Plaintiff seeks a preliminary injunction prohibiting Defendants from releasing, marketing, or otherwise promoting their children's educational product under the name iXL. Defendants oppose the motion. The Court has considered the moving papers, declarations, and exhibits presented by counsel at the hearing on June 11, 2010. For the reasons discussed below, the motion will be conditionally denied.

### I. BACKGROUND

    On May 3, 2010, Plaintiff Quia Corporation ("Plaintiff" or "Quia") filed the instant action

---

[1] This disposition is not designated for publication in the official reports.

against Mattel, Inc. ("Mattel") and Mattel's wholly owned subsidiary, Fisher-Price, Inc. ("Fisher-Price") (collectively, "Defendants"). Plaintiff alleges trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114-1117, and unfair competition under both the Lanham Act, 15 U.S.C. § 1125(a), and California's unfair competition law, Cal. Bus. & Prof. Code § 17200.

### A. The Parties

Plaintiff is an educational technology company founded in 1999 whose "e-learning products and services combine technical sophistication with ease of use for educators and learners alike." (Compl. ¶ 7; Decl. of Paul Mishkin ("Mishkin Decl.) ¶ 2.) Fisher-Price is a toy company founded in 1930 that became a wholly owned subsidiary of Mattel in 1993. (Decl. of Shehnaz Safiuddin ("Saf. Decl.") ¶ 26.) In 2008, Fisher-Price's brands grossed $2.36 billion in sales worldwide. (Saf. Decl. ¶ 27.)

### B. The Products

In 2007, Plaintiff launched a web-based product or program called "IXL" which "generates unlimited practice questions on a multitude of mathematical concepts for children in the pre-elementary school stages of development through sixth grade and beyond." (Compl. ¶ 7; *see also* Mishkin Decl. ¶ 4.) According to Plaintiff, IXL is "[a]ligned with the content of popular textbooks and state standards" and is "replete with 'game like' features to keep students absorbed in practicing." (Mishkin Decl. ¶ 4.)

IXL is offered to consumers through Plaintiff's website, http://www.ixl.com. The site offers a free option that allows anyone to work on twenty problems each day and a monthly or annual subscription option for those who choose to set up an account on the site. (Mishkin Second Supp. Decl. ¶ 8.) Membership costs for families are $9.95 per month or $79.00 per year. (Mishkin Decl. ¶ 9.) Plaintiff also offers annual memberships to schools at a cost of $199.00 for each thirty-student classroom in which the school intends to use IXL. (*Id.*) Plaintiff advertises and promotes IXL through its main website, http://www.Quia.com, as well as through http://www.ixl.com and another site it owns, http://www.ixlmath.com, and through third-party websites such as http://www.homeschoolbuyersco-op.org. (Mishkin Decl. ¶ 5.) Plaintiff also advertises through Internet search engines such as Google.com and Bing.com both by bidding on

search keywords and by utilizing the engines' "content networks."  (Mishkin Decl. ¶ 6; *see also* Mishkin Second Supp. Decl. ¶ 8 ("Quia only bid on the term 'ixl,' which caused Google to display [Quia's] ad on searches that it determined were related.").)  Among other things, Plaintiff's advertisements tout IXL as "[t]he Web's best math site for school and home practice."  (*See* Mishkin Decl. at Ex. A-5.)

On March 24, 2009, pursuant to Plaintiff's application, the United States Patent and Trademark Office ("USPTO") issued U.S. Servicemark Registration No. 3,596,291 (the "'291 Registration") for "IXL."  The registration covers "educational services, namely, online instruction in the fields of math, science, English and foreign languages for use in the future."  (Compl. Ex. E ("'291 Registration").)

For several years, Fisher-Price has worked to develop a "smart device" handheld toy for young children.  The final product is "an $80 multi-tech smart device toy with six applications: a story book, [a] game player, [a] notebook, [an] art studio, [a] music player and [a] photo album."  (Defs.' Opp'n 3 (citing Saf. Decl. ¶¶ 4, 14).)  The device comes with a software CD "to enable parents to download additional software via USB port onto the device."  (Saf. Decl. ¶ 10.)  The additional software will be sold separately as CDs and the content on the CDs "will reside only in the 'My Library' section of the iXL content management program."  (Saf. Decl. ¶ 11.)  The product has no Internet connection, and "[o]nce parents load the software onto the device via USB port, the child is off and running (the software contents cannot be 'played' on the computer at all.[sic])[.]"  (Defs.' Opp'n at 4 (citing Saf. Decl. ¶ 14).)  While the device "is a very smart toy which adds a 'learning' element to play activities," "[i]t is *not* an online service or curriculum, there is no current technological capability for the device to become online compatible and there are no plans to expand the product in this direction."  (*Id.* (citing Saf. Decl. ¶¶ 12-13) (emphasis in original).)

In January 2010, Fisher-Price chose the name "iXL" for its new smart device toy.  The company first showcased the toy in February 2010 at the New York Toy Fair, "the biggest media event of the year for the toy industry."  (Defs.' Opp'n 4.)  Since February, Fisher-Price "has developed detailed marketing plans for each month from June through December in connection

1   with major retailers who have already committed shelf space and floor space for the iXL." (*Id.* at
2   5 (citing Saf. Decl. ¶ 18).)  The iXL is "expected to be available for purchase in stores by late
3   June and early July." (*Id.* at 8 (citing Decl. of Brian Erickson ("Erickson Decl.") ¶¶ 9-10).)

      **C.**     **Procedural History**

On May 12, 2010, Defendants filed a joint answer as well as counter-claims for declaratory judgment and trademark cancellation.  On May 24, 2010, Plaintiff filed the instant motion for preliminary injunction as well as an application for a temporary restraining order ("TRO").  The hearing on the instant motion originally was set for July 9, 2010.  Defendants opposed the motion.  In an order dated May 28, 2010, the Court denied Plaintiff's application for a TRO and set the instant motion for hearing on an expedited schedule, reasoning that "Plaintiff will not suffer irreparable injury from Defendants' alleged servicemark infringement, if at all, before the product actually is available for sale to the general public, which will occur at the earliest in late June." (Dkt. No. 36 at 1 (citation omitted).)  On June 7, 2010, Plaintiff filed its answer to Defendants' counterclaims and its reply in support of the instant motion.  On January 10, 2010, Defendants filed a motion for leave to file a surreply in opposition to Plaintiff's motion and attached the surreply to the motion.  The Court granted the motion on the record at the hearing on June 11, 2010, and invited Plaintiff to respond.  Plaintiff responded to the surreply on January 15, 2010.

## II. LEGAL STANDARD

The issuance of a preliminary injunction is committed to the discretion of the District Court.  *Indep. Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 651 (9th Cir. 2009).  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 376 (2008).  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate [1] 'that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 129 S.Ct. at 374).  Following *Winter*, the Ninth Circuit

made clear that "to the extent [its] cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).

### III.  DISCUSSION

#### A.  Likelihood of Success on the Merits[2]

"To prevail on its claim of trademark infringement, [Plaintiff] must prove: (1) that it has a protectible [sic] ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion, thereby infringing upon the State's rights to the mark." *Dep't of Parks & Recreation for State of Cal. v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985) (en banc)).

#### 1.  Protectable Ownership Interest in the Mark

Quia's federal registration of the "IXL" servicemark, which is undisputed, is prima facie evidence of its ownership of that mark.  15 U.S.C. §§ 1057(b), 1115(a); *see also Bazaar del Mundo*, 448 F.3d at 1124.

#### 2.  Consumer Confusion

Plaintiff alleges that Defendants' use of "iXL" is likely to cause both forward and reverse confusion.

> Forward confusion occurs when consumers mistakenly associate a junior user's mark with that of a "well-known senior mark." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n. 5 (9th Cir.1998).  Reverse confusion cases, however, involve consumers dealing with a senior trademark-holder believing all the while that they are doing business with a junior user. *See Surfvivor Media, Inc.*[*v. Surivivor Prods.*], 406 F.3d [625,] 630 [(9th Cir. 2005)].

*M2 Software, Inc. v. Mandacy Entm't*, 421 F.3d 1073, 1080 (9th Cir. 2005).

The Ninth Circuit recently reaffirmed the appropriate test for both theories:

---

[2]Plaintiff's moving papers address only its trademark infringement claim and do not address the elements of its unfair competition claims, though Plaintiff argues in a footnote that it is entitled to an injunction under California law and that the standard for injunctive relief under California law is identical to the standard for Lanham Act claims. (Pl.'s Mot. 19 n.1.)

5

To determine whether a "likelihood of confusion" exists, we employ the eight factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979), *abrogated in part on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir.2003): "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines." Whether there is a likelihood of confusion between two competing marks is a question of fact. *Quiksilver*[*, Inc. v. Kymsta Corp.*], 466 F.3d [749,] 759 [(9th Cir. 2006)].

We have long cautioned that applying the *Sleekcraft* test is not like counting beans. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998). "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield*[ *Commc'ns, Inc. V. West Coast Entm't Corp.*], 174 F.3d [1036,] 1054 [(9th Cir. 1999)]. "Although some factors–such as the similarity of the marks and whether the two companies are direct competitors–will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of the factors." *Id.* The *Sleekcraft* factors are not exhaustive, "and non-listed variables may often be quite important." *Id.*

*One Industries, LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009).

    **a.**    **Forward Confusion**

        **i.**    **Strength of the mark**

The strength of a trademark is evaluated "in terms of its conceptual strength and commercial strength." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000). Plaintiff contends that its mark is both conceptually and commercially strong.

Conceptually, "[t]he strength of a mark is determined by its placement on a continuum of marks from 'generic,' afforded no protection; through 'descriptive' or 'suggestive,' given moderate protection; to 'arbitrary' or 'fanciful' awarded maximum protection." *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (citation omitted). Plaintiff contends that the IXL mark is entitled to broad protection because it is "an arbitrary collection of letters that do not suggest what the product is." (Pl.'s Mot. 14.) Defendants argue that the mark is presumptively weak because it is suggestive of "a characteristic of Quia's service, i.e. that a student (i.e. 'I') may 'excel' through Quia's math curriculum." (Defs.' Opp'n 12.) Defendants point to Quia advertisements and website content drawing the connection between the mark and students "excelling" through use of the product, as well as the deposition testimony of Paul Mishkin, Quia's founder and CEO, in which Mishkin admits that "IXL" suggests "I excel." (*See*

1 Mishkin Depo. 46:19-47:1.)

2      Defendants contend further that Plaintiff's mark is conceptually weak because it is part of
3 a "crowded field" of IXL and XL marks. Defendants claim that "[a]t least 27 other companies
4 and businesses use 'IXL' or 'XL' or phonetic variations of these names in educational, math, and
5 computer-related fields." (Defs.' Opp'n 7.) According to Defendants, the crowded field
6 weakens Plaintiff's mark because "Quia cannot establish a 'mental recognition in buyers' and
7 potential buyers' minds' between 'IXL' and a single source, when there are several sources in the
8 marketplace." (*Id.* at 12 (citing *One Indus.*, 578 F.3d at 1164-65.)

9      Plaintiff claims that Defendants' arguments as to the weakness of Plaintiff's mark are
10 belied by Defendants' own trademark applications for the "iXL" mark, the success of which
11 requires a mark to be distinctive. Plaintiff also dispute Defendants' claim that "IXL" is
12 suggestive, arguing that a mark must suggest a feature rather than a "characteristic" of the
13 product. Plaintiff relies upon a survey prepared by Dr. Yoram Wind in which no respondent
14 understood "IXL" to mean "I excel" or "I will excel at math." It maintains that "Defendants have
15 presented no evidence (other than lawyer argument) that there is a 'commonly-known
16 connection' between 'IXL' or even 'I excel' and an online math product for young children."
17 (Pl.'s Reply 8.)

18      Plaintiff also contends that Defendants' "crowded field" argument is flawed because "a
19 crowded field can result only from the use of similar mark [sic] on *similar goods*." (*Id.*
20 (emphasis in original).) Plaintiff asserts that most of the uses of "IXL" or "XL" and their
21 variations cited by Defendants do not involve goods similar to Quia's product and that "[a]t
22 most, Defendants produce evidence of a small handful of third-party uses of variations of 'IXL'
23 on math curriculum-related products," but do not "show that any of them are well-promoted or
24 even recognized by consumers." (*Id.* at 8-9.)

25      The Court concludes that the conceptual strength of the mark is a close question. On one
26 hand, evidence in the record indicates that "IXL" is not completely arbitrary and was chosen at
27 least in part because of its relationship to the product's goal: helping children "excel" in math
28 and in school generally. On the other hand, nothing in the record indicates that "IXL" suggests

anything specific about the product. Neither Mattel's own trademark applications nor the failure of third parties using variations of the "IXL" mark in conjunction with math curriculum-related products to achieve wide recognition demonstrate that Plaintiff's mark is conceptually strong. *See, e.g.*, *One Indus.*, 578 F.3d at 1164-65 (finding that although the mark was "fanciful," evidence of other companies' use of the similar marks weakened the plaintiff's mark). At best, therefore, the conceptual strength factor tips very slightly in Plaintiff's favor.

Plaintiff also contends that its mark is "commercially robust." "A mark's commercial strength refers to its degree of recognition in the minds of the relevant consumer class, most often measured by the amount of advertising." *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989). To support its claim that IXL "has been wildly successful and advertised extensively through the web," (Pl.'s Mot. 14), Plaintiff relies upon several paragraphs in Mishkin's declaration and an attached exhibit purporting to show sales data. Defendants argue that despite Mishkin's declaration, Quia "has little evidence of the effectiveness of its advertising, how many commercial impressions it created, or the unaided awareness of its mark." (Defs.' Opp'n 13.)

The Ninth Circuit has held that:

> A mark's overall strength is relative and cannot be determined by mechanistically assessing its conceptual or commercial strengths. Our court has previously recognized that a suggestive or descriptive mark, which is conceptually weak, can have its overall strength as a mark bolstered by its commercial success. . . . But we have never held that an arbitrary or fanciful mark (i.e., a conceptually strong mark) can have its overall strength diminished by feeble commercial success.

*M2 Software*, 421 F.3d at 1081. While the evidence shows that Quia has advertised exclusively on the Internet and that advertising through that medium presumably has helped it attract consumers, the evidence does not demonstrate "wild" or "robust" success it claims. In light of the the conflicting evidence with respect to conceptual strength and the limited evidence of the commercial strength of the mark, the Court concludes that this factor at best slightly favors Plaintiff and that the mark deserves only moderate protection.

      **ii.**  **Proximity of the goods**

In assessing this factor, courts look to see whether the goods are related or

complementary. *M2 Software*, 421 F.3d at 1081-82 (citing *Sleekcraft*, 599 F.2d at 350). If they are, "the danger of confusion is heightened." *Id.* at 1082. Plaintiff contends that its IXL product and Defendants' iXL learning system share "numerous similarities" such that a reasonable consumer could associate the products with each other. Plaintiff makes three arguments in support of its position: first, that "both products are marketed by the parties to help young children learn math and language skills"; second, that "both products are in the same 'technological' space" because Plaintiff's product is offered over the Internet and can be used on a handheld device such as an iPhone or iPad, while Defendants' product is a handheld learning system that depends on the Internet for software downloads; and third, that "because many companies (particularly Defendants) sell toys that also have an online component or service, consumers could easily associate a handheld toy with an online application or service related to that toy." (Pl.'s Mot. 9-10.) Plaintiff contends further that online educational products such as its IXL are competing directly with real-world educational handheld toys that are similar to Defendants' iXL.

Defendants maintain that the products are not related, let alone competitive with one another. They argue that products are proximate only if they are similar in use and function, and that in this case the iXL is a tangible product while the IXL is an online-only service. Defendants also argue that the products do not share the same "technological space" because once the software is downloaded onto their iXL, the device "is a stand-alone product that is not dependant [sic] upon a computer to play with." (Defs.' Opp'n 15.) Generally, Defendants contend that "[a] broad tie to 'learning' does not make the parties' products and services directly or indirectly compete with each other." (*Id.* at 16.)

The Court concludes that the relationship between the two products, if any, is insufficient to support a finding of consumer confusion. Two cases cited by both parties in their papers are illustrative. In *Maxim Integrated Products, Inc. v. Quintana*, the plaintiff alleged that the defendant's "My-iButton" product, "a portable MP4 promotional device that has a 2-inch LCD screen on which it displays videos or pictures" infringed upon its trademarked "i Button" product line, "a computer chip enclosed in a 16mm-thick stainless steel can that delivers and records

data." 654 F. Supp. 2d 1024, 1029 (N.D. Cal. 2009).  The district court granted the plaintiff's motion for preliminary injunction at least in part because while the parties' products differed in their range of functionality and marketed uses, "both parties s[old] goods in the general field of small portable electronics." 654 F. Supp. 2d at 1032.

In contrast, in *M2 Software*, the plaintiff distributed acid jazz music and CDs and the defendant distributed sports-related music and CDs.  The Ninth Circuit concluded that the district court did not err in finding that "if [the proximity factor] can support plaintiff's case at all, [it] does so very slightly." *M2 Software*, 421 F.3d at 1082.  Plaintiff contends that "the products at issue in *M2 Software* did not share the close nexus in functionality and purpose that Quia's IXL service shares with the iXL device." (Pl.'s Reply 11.)  The only difference in "functionality and purpose" between the products at issue in *M2 Software* that the Ninth Circuit found relevant to the proximity inquiry was the genre of music the parties distributed. *M2 Software*, 421 F.3d at 1082.

Here, the Court finds that the parties' products are not sold in the same reasonably broad general field as the products at issue in *Maxim* were.  To the contrary, Defendants' iXL handheld 6-in-1 product is more closely associated with the small portable electronics at issue in that case than it is with Plaintiff's online-only, state standards-based math practice software.  Similarly, the connection between the function and purpose of the products here–that both products are designed to help children learn in some capacity–is much more attenuated than in *M2 Software*. This factor thus weighs against Plaintiff.

### iii.   Similarity of the marks

The Ninth Circuit has acknowledged that the similarity of the marks is "a critical question" in the *Sleekcraft* analysis and also has provided the following guidance in assessing similarity: "first, the marks must be considered in their entirety and as they appear in the marketplace [citation omitted]; second, similarity is adjudged in terms of appearance, sound, and meaning [citation omitted]; and third, similarities are weighed more heavily than differences [citation omitted]." *Disney*, 202 F.3d at 1205-06.

Plaintiff contends that the parties' marks as they appear in the marketplace are "strikingly

1  similar." (Pl.'s Mot. 8.) Plaintiff cites the marks' use of bold, block uppercase letters, the
2  similar placement of the marks on the parties' websites, and the overlapping of the "X" and the
3  "L" in both marks. Plaintiff argues that the distinction between the uppercase "I" in Plaintiff's
4  mark and the lowercase "i" in Defendants' is "particularly inconsequential" because it does not
5  change the overall commercial impressions of the marks and because Internet search engines
6  treat them the same way. (Pl.'s Mot. 8.) Plaintiff also asserts that the identical sound of the
7  letters when sounded out weighs in its favor.

8  Defendants contend that the marks should not be compared "side-by-side, cropped, or
9  proportionally distorted" as they are in Plaintiff's moving papers. (Defs.' Opp'n 13.) According
10 to Defendants, the Court should look at Defendants' mark in the context of its packaging, upon
11 which the "iXL" logo is accompanied by "the famous Fisher-Price mark and scallop logo." (*Id.*
12 at 14.) Defendants also highlight differences in the style and color of the letters as they appear in
13 context. Defendants claim that Plaintiff "frequently refers to its mark [as] 'IXL Math' over
14 'IXL,' [and] the top-line header and the tab title of its website both read 'IXL Math.'" (*Id.*)

15 Defendants argue that despite the fact that both marks use the same three letters, the
16 marks "create a very different commercial impression." (*Id.*) In contrast to Plaintiff's use of the
17 mark, with respect to which the phonetic "excel" has "a direct correlation to [Plaintiff's] math
18 curriculum," Defendants maintain that "iXL conveys the impression of being an interactive
19 (hence the lower case letter 'I') handheld computer device, which is the essence of the product."
20 (*Id.* at 15.)

21 Plaintiff contends that the fact that Defendants' mark is accompanied by the Fisher-Price
22 "house mark" increases rather than decreases the likelihood of reverse confusion. It cites case
23 law holding that a defendant's house mark does not render a mark non-similar. *See Americana*
24 *Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992) (holding that the district
25 court erred in finding no issues of material fact with respect to likelihood of confusion based on
26 the prominence of the defendant's house mark). However, while it is true that a house mark
27 could increase the likelihood of reverse confusion under some circumstances, Plaintiff does not
28 explain how that might occur here.

Plaintiff also argues that Defendants' reliance on *Surfvivor Media, Inc. v. Survivor Products*, 406 F.3d 625 (9th Cir. 2005), is misplaced. In that case, the Ninth Circuit affirmed the lower court's order granting summary judgment in favor of the defendant, the production company responsible for the creation of the television show *Survivor*, in a trademark infringement action brought by the plaintiffs, who owned three trademarks for the mark "Surfvivor" that had been used to sell Hawaiian beach-themed products. *Surfvivor*, 406 F.3d at 628-29. In assessing the similarity of the parties' marks, the court found that "visual subfactor" favored the defendant because the defendant's mark "is usually accompanied by the distinctive slogan "outwit[,] outplay[,] outlast,' or a stylized graphic." *Id.* at 633. However, after finding that the "sound subfactor" favored the plaintiffs because the marks were "nearly identical" phonetically and that the "meaning subfactor" slightly favored the defendant because the words had different understood meanings, the court held that there was no issue of material fact with respect to the similarity factor because the subfactors did not weigh in favor of either party. *Id.*

Defendants cite *Surfvivor* to support their argument that the marks at issue here "create a very different commercial impression" despite the fact that they use the same three letters. (Defs.' Opp'n 14.) Plaintiff contends that the marks in this case are much more similar than the marks at issue in *Surfvivor* because the font of the letters is nearly identical and because "the marks are presented in very similar fashion–with the letters close and overlapping, and alongside bright colors and cartoons appealable to children." (Pl.'s Reply 9-10.)

Plaintiff is correct that the two marks, set side-by-side and isolated from the respective contexts in which they appear to consumers, are "strikingly similar." However, when viewed as they appear in the marketplace–Plaintiff's on its websites; Defendants' on the packages for the iXL device and its software, and electronic images thereof, always accompanied by the Fisher-Price logo–the marks are far less similar and therefore far less likely to confuse the reasonably prudent consumer. In fact, as Defendants point out, Plaintiff's expert, Dr. Wind, "conceded that when presented the package of the iXL toy (even when *side-by-side* with Quia's IXL Math advertisement), his survey data indicates confusion was unlikely (≈8% confusion)." (Defs.' Opp'n 10 (citing Wind Depo. 175:16-176:4 and 178:4-10) (emphasis in original).)

12

1    While searches using the two marks in Internet search engines will return identical results
2 because both marks use the same three letters in the same order, this is not sufficiently
3 representative of how the marks appear in the marketplace.  The Court concludes that the
4 similarity of the marks at best is neutral in the *Sleekcraft* analysis.

### iv. Evidence of actual confusion

6    While evidence of actual confusion is not required, *see Perfumebay.com Inc. v. eBay,*
7 *Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007), it "constitutes persuasive proof that future confusion is
8 likely." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (citations and
9 internal quotations omitted).  Plaintiff relies on a survey conducted by Dr. Yoram Wind of the
10 Wharton School of Business to support its contention that there is substantial confusion between
11 the two marks in the marketplace.  Defendants counter Dr. Wind's analysis with that of their own
12 expert, Dr. Itamar Simonson of Stanford, but they also point out that Plaintiff does not cite a
13 "single instance of real-world confusion" in its brief.  (Defs.' Opp'n 19.)  In response, Plaintiff
14 cites case law supporting the proposition that actual confusion is not required to succeed on a
15 motion for preliminary injunction.  Plaintiff is correct.  This factor does not weigh in its favor,
16 but neither does it defeat the motion.  *See Brookfield*, 174 F.3d at 1050 ("The failure to *prove*
17 instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual
18 confusion is hard to prove; difficulties in gathering evidence of actual confusion make its
19 absence generally unnoteworthy.").

### v. Marketing channels used

21    "Convergent marketing channels increase the likelihood of confusion." *Nutri/System,*
22 *Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir.1987).  Plaintiff contends that this factor
23 weighs in its favor because both parties use the Internet to market and sell their products.
24 Plaintiffs claim that most of its marketing and promotion of the IXL program takes place online.
25 With respect to Defendants' iXL product, Plaintiffs claim that Defendants have issued a press
26 release online about the product, that "the Internet is awash with numerous advertisements,
27 promotional materials, and reviews regarding" the product, and that "both Amazon.com and
28 Target.com already have iXL pages set up in preparation for the iXL release and are actually

taking back orders for the device." (Pl.'s Mot. 12-13.) Plaintiff also points out that several of the online reviews appear in searches for Plaintiff's IXL product.

Defendants contend that this factor weighs against Plaintiff because there is no significant overlap in marketing channels. Defendants claim that unlike Plaintiff's marketing efforts, their efforts are aimed at an "in-store experience" and that, while Defendants "like every other modern company, have a web presence," "Defendants do not currently operate an iXL-specific dedicated website (e.g. www.ixl_____.com) for this product, and one is not are [sic] contemplated." (Def.'s Opp'n 18-19.) Defendants assert that to the extent there is overlap through sponsored links, such overlap is to be expected because Plaintiff has spent at least forty-three percent of its web-based advertising budget on Google advertising in the last five months, including "buying keywords that go to the heart of Defendants' iXL handheld device." (*Id.* at 19.)

Though both products are marketed and sold on the Internet, this fact, without more, is insufficient to demonstrate that this factor supports a finding of consumer confusion. The record demonstrates that unlike Defendants', Plaintiff's product is not sold in any physical stores and is not available for sale through Amazon.com, similar websites, or major retailers' websites. *See M2 Software*, 421 F3d at 1083-94 (holding that the "marketing channels used" factor "tilt[ed] strongly" toward the defendant even though the parties products had been launched at the same music industry trade show, had been advertised in similar magazines, and were both sold over the internet and on Amazon.com because (1) the trade shows at which the products were launched occurred ten years apart; (2) the plaintiff's products, but not the defendant's, were promoted in specialty industry publications; (3) the plaintiff failed to provide evidence of sales attributable to its website; and (4) the plaintiff's products were not sold in retail outlets).[3]

---

[3] To the extent that the parties' use of the Internet could be a source of confusion, such confusion is easily addressed by a simple disclaimer. Pursuant to its colloquy with counsel on the record and in the exercise of its equitable discretion, the Court will require Defendants to include such a disclaimer in all web-related advertising. *See* Part IV, below.

14

          **vi.    Type of goods and the degree of care likely to be exercised by the purchaser**

Plaintiff contends that this factor "at best is neutral." (Pl.'s Mot. 16.) It argues that while the average reasonably prudent consumer may exercise less care purchasing the two products at issue because they are relatively inexpensive, "[i]t is also possible . . . that educators and parents may exercise more care in this context because the product is for a child's educational wellbeing." (*Id.*) Defendants contend that Plaintiff understates the significance of this factor. They point to the relatively expensive cost of their device ($80) for a three-to-seven year-old, the per-month and per-year costs of Plaintiff's product, the fact that the products are aimed at parents and educators with vested interests in children's educational development, and the complicated process required to sign up for Plaintiff's product. They maintain that "[i]n light of the care, sophistication, and nature of Plaintiffs' transactions and their niche group of clients, and the nature of Defendants' purchasers, future name confusion is highly unlikely." (Defs.' Opp'n 17.)

Plaintiff argues that even accepting that parents and teachers will exercise a high degree of care, confusion is likely because the marks are identical. The Court is not persuaded by this argument based on the present state of the record.

          **vii.    Defendants' intent in selecting the mark**

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield*, 174 F.3d at 1059 (citation omitted). However, "this factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark (or to the extent that a court wishes to consider it as an equitable consideration)." *Id.* (citing *Sleekcraft*, 599 F.2d at 348 n. 10).

Plaintiff contends that Defendants had both constructive and actual notice of Plaintiff's ownership of the IXL mark. First, it argues that Mattel's first intent-to-use application for "iXL" on January 13, 2010, put Mattel on at least constructive notice of Plaintiff's registration of the "IXL" servicemark, which occurred on March 24, 2010. Second, Plaintiff contends that Mattel abandoned its first trademark application and filed a new application without using the words

1  "children," "education," and "learning" after it was put on actual notice of Plaintiff's registration.
2  Plaintiff maintains that "Mattel's new application should be seen for what it is: a transparent
3  attempt to avoid an adverse office action at the USPTO and a claim of infringement by Quia in
4  federal court." (Pl.'s Mot. 15-16.)
5      Defendants do not suggest that they lacked constructive notice of Plaintiff's registration
6  when they adopted the "iXL" name, but they claim that the name was chosen in good faith
7  because none of the people "who developed, designed or conceived the name ("iXL") had ever
8  heard of Quia's IXL service" when the iXL name was chosen in January 2010. (Defs.' Opp'n
9  21.) Defendants also contend that Quia's characterization of the second trademark application
10 "is based on rank speculation and seeks to imply a nefarious intent when there was none." (*Id.*)
11     Under 15 U.S.C. § 1702, Defendants were on constructive notice of Plaintiff's
12 registration when Fisher-Price adopted the "iXL" name for its device. *See, e.g., Moroccanoil,*
13 *Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271, 1280. However, Plaintiff has not
14 demonstrated how Defendants' constructive knowledge of the registration bears upon the
15 likelihood of confusion between the products.

16         **viii.**    **Likelihood of expansion of the product lines**

17     Plaintiff argue that this factor is "relatively unimportant" when the parties already
18 compete in the same product line. Defendants maintain that they do not intend to offer any
19 online iXL curriculum. This factor does not affect the analysis under these facts.

20         **ix.**    **Summary**

21     According each of the *Sleekcraft* factors its due weight, the Court finds and concludes
22 that Plaintiff has failed to demonstrate a likelihood of success on the merits of its trademark
23 infringement claim on a forward confusion theory. The balance of the factors leans heavily
24 toward a finding that the reasonably prudent consumer of these products would not be confused
25 by the similarity of the marks and the manner in which they are used.

26       **b.**    **Reverse Confusion**

27     Plaintiff alleges alternatively that Defendants' use of the "iXL" mark infringes by creating
28 reverse confusion. "[R]everse confusion occurs when consumers dealing with the senior mark

holder believe that they are doing business with the junior one." *Surfvivor*, 406 F.3d at 630. "The Ninth Circuit has suggested that three *Sleekcraft* factors are especially pertinent in reverse confusion cases: (1) the strength or arbitrariness of the mark; (2) the relatedness of the parties' goods; and (3) the similarity of the marks." *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 986 (C.D. Cal. 2002) (citing *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998)).

In determining the strength or arbitrariness of the mark in a reverse confusion case, the court analyzes the commercial strength of the junior user's mark and the conceptual strength of the senior user's mark. The latter is addressed above. With respect to the former, Plaintiff points to evidence in the record of Mattel's vast advertising and promotional expenditures in recent years and argues that "Mattel's marketing and advertising of its iXL Learning System online has already overtaken and displaced Plaintiff's online advertising and promotional activities in a significant, harmful way" and allowing release of the device will only worsen the situation. (Pl.'s Mot. 18.) In support of this assertion, Plaintiff relies exclusively on a single paragraph in Mishkin's declaration and a single attached exhibit, both of which purport to demonstrate that various searches on Google and similar Internet search engines for terms such as "ixl for preschoolers" return results for Defendants' product either ahead of Plaintiff's or intermixed with Plaintiff's. Defendants object to this evidence on relevance grounds, arguing that Mishkin's statements are not indicative of a likelihood of confusion. Defendants also argue that its own evidence demonstrates that the search used as an example, "ixl for preschoolers," is one that is replicated fewer than ten times per month.

Ultimately, this factor is not dispositive. Even if the Court were to accept Plaintiff's contention that Defendants' iXL device is likely to overwhelm Plaintiff's IXL product to the extent that the products compete with one another, Plaintiff has not demonstrated that consumers who encounter Plaintiff's online math practice software will believe that it is associated with Defendants' handheld device. *See Glow*, 252 F. Supp. 2d at 992 ("[W]hile defendants' commercial strength is likely to overwhelm plaintiff in the marketplace to the extent their products compete, the court concludes that Glow, Inc. will not likely be able to prove that the

strength of the mark factor favors a finding of likelihood of confusion because its own mark is conceptually weak and operates in a crowded field.")

### B.     Remaining Preliminary Injunction Factors

In light of the foregoing discussion and the Court's conclusion that Plaintiff has failed to demonstrate a likelihood of success on the merits, the parties' remaining arguments, including those related to the presumption of irreparable harm, are moot.[4]

### IV.  CONCLUSION

Pursuant to the foregoing discussion, Plaintiff's motion for a preliminary injunction will be denied.  However, pursuant to the discussion on the record at the hearing, Defendants shall include the following disclaimer on all of their proprietary websites where iXL is and will be offered for sale and in all of their first-party advertising for the iXL and iXL software:

> Fisher-Price's iXL Learning System and related software bear no relationship to IXL, "The Web's #1 Math Practice Site," owned and operated by Quia Corporation and accessible at http://www.ixl.com.

 IT IS SO ORDERED.

DATED: June 15, 2010

_____
JEREMY FOGEL
United States District Judge

---

[4] Defendants also object to certain evidence and move to strike two declarations submitted by Plaintiff.  Because Plaintiff's motion will be denied, the objections and motions to strike also are moot.

18

Case Number C 10-1902 JF (HRL)
ORDER CONDITIONALLY DENYING MOTION FOR PRELIMINARY INJUNCTION
(JFLC3)