\*\*E-Filed 7/14/2011\*\*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| QUIA CORPORATION, | Case Number C 10-1902 JF (HRL) |
| Plaintiff/Counter-Defendant, | ORDER[1] GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |
| v. | |
| MATTEL, INC. and FISHER-PRICE, INC., | |
| Defendants/Counter-Plaintiffs. | |

Plaintiff IXL Learning, Inc., formerly known as Quia Corporation, brings this action against Defendants Mattel, Inc, and Fisher-Price, Inc., alleging that Defendants' iXL Learning System, a "smart device" for preschool children, infringes on its trademark. Defendants move for partial summary judgment precluding Plaintiff from pursuing a theory of harm based on search engine placement and determining that Plaintiff has not suffered actual damages and is not entitled to monetary relief; that there is no triable issue of fact as to forward confusion; and that Plaintiff's IXL registration is void *ab initio* as to any educational services other than

---

[1] This disposition is not designated for publication in the official reports.

mathematics. The motion will be granted in part and denied in part as discussed below.

## I. BACKGROUND

Plaintiff[2] filed the instant action against Mattel and Mattel's wholly-owned subsidiary, Fisher-Price, on May 3, 2010. Plaintiff alleges trademark infringement under the Lanham Act, 15 U.S.C. §§ 1114-1117, and unfair competition under both the Lanham Act, 15 U.S.C. § 1125(a), and California's unfair competition law, Cal. Bus. & Prof. Code § 17200.

Plaintiff is an educational technology company founded in 1998 to create online study materials. Decl. of Paul Mishkin ¶¶ 2-3. Fisher-Price is a toy company founded in 1930 that became a wholly-owned subsidiary of Mattel in 1993. Decl. of Shehnaz Safiuddin ("Saf. Decl.") ¶ 26. In 2008, Fisher-Price's brands grossed $2.36 billion in sales worldwide. Saf. Decl. ¶ 27.

In 2007, Plaintiff launched a web-based product or program called "IXL" that generates practice questions on a variety of mathematical concepts and related topics for children in the pre-elementary school stages of development through eighth grade. Mishkin Decl. ¶ 3. According to Plaintiff, IXL involves "game like" features to keep students absorbed in practicing. Mishkin Decl. ¶ 4.

IXL is offered to consumers through Plaintiff's website, http://www.ixl.com, and is marketed to both parents and educators. According to Plaintiff, more than 920,000 school-age children have access to IXL through subscriptions obtained by teachers and schools, and 85,000 additional children have access to the site through family subscriptions. *Id.* ¶ 9. The site also allows limited free access to study materials without a subscription. Plaintiff advertises on websites such as Google.com, Bing.com, and Facebook.com, and it also uses Google's advertising network to place advertisements on education-related websites. Mishkin Decl. ¶ 10. Among other things, Plaintiff's advertisements tout IXL as "[t]he Web's #1 math practice site."

---

[2] In 2010, Plaintiff changed its name from Quia Corp. to IXL Learning. Plaintiff states that this name change had been planned since 2007 when it purchased the URL www.ixl.com and launched its IXL product. (Mishkin Decl., ¶ 11.) Defendants observe that the name change occurred months after Fisher-Price launched its "IXL Learning System," and that to the extent that the record indicates that Plaintiff was considering a name change before that time, the name considered was simply "IXL" rather than "IXL Learning."

2
Case Number C 10-1902 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
(JFLC3)

1  *See* Mishkin Decl. at Ex. A-5.

2  On March 24, 2009, the United States Patent and Trademark Office ("USPTO") granted
3  Plaintiff U.S. Servicemark Registration No. 3,596,291 (the "'291 Registration") for "IXL." The
4  registration covers "educational services, namely, online instruction in the fields of math,
5  science, English and foreign languages for use in the future." Compl. Ex. E ("'291
6  Registration").

7  For several years, Fisher-Price has worked to develop a "smart device" handheld toy for
8  young children. The final product is "an $80 multi-tech smart device toy with six applications: a
9  story book, [a] game player, [a] notebook, [an] art studio, [a] music player and [a] photo album."
10 Defs.' Opp'n 4 (citing Saf. Decl. ¶¶ 4, 14). The device comes with a software CD "to enable
11 parents to download additional software via USB port onto the device." Saf. Decl. ¶ 10. The
12 additional software will be sold separately, and the content on the compact disks "will reside
13 only in the 'My Library' section of the iXL content management program." Saf. Decl. ¶ 11. The
14 product has no Internet connection, and "[o]nce parents load the software onto the device via
15 USB port, the child is off and running (the software contents cannot be 'played' on the computer
16 at all.[sic])[.]" Defs.' Opp'n at 4 (citing Saf. Decl. ¶ 14).

17 In January 2010, Fisher-Price's parent company Mattel filed a trademark application for
18 "iXL," describing the goods and services as "[c]hildren's educational toys and devices, namely,
19 handheld learning systems featuring interactivre [sic] digital books, games, art activities, music
20 players, writing tools and photo albums." Meylan Decl., ex. P. In connection with the
21 application, Fisher-Price conducted a trademark search and became aware of Plaintiff's mark.
22 *Id.*, ex. M. At or about the same time, the Fisher-Price graphic artist responsible for designing
23 the iXL logo circulated a link to Plaintiff's website. *Id.*, ex O. On April 7, 2010, after the iXL
24 Learning System had been announced, Plaintiff's counsel sent a cease-and-desist letter to Fisher-
25 Price. On April 19, 2010, Fisher-Price filed a notice of abandonment of its trademark
26 application and refiled a new application defining the goods and services as a "handheld mobile
27 computer incorporating a music player, camera, digital notebook and electronic photo album;
28 computer software for use in reading electronic books, playing computer games, creating and

3

viewing art, playing music, word processing, and creating and viewing photo albums, all for a handheld mobile computer." *Id.*, ex. AE.

Fisher-Price has engaged in an extensive internet and social media campaign to promote its product. These activities include email "blasts," Facebook applications, You-Tube channels, and tie ins with "mommy bloggers." *Id.*, ex. AA. Defendants' advertising agency has concluded that the campaign resulted in over 1.5 million "engagements," including of video views, comments, ratings, tags, and tweets. *Id.*, ex. AD.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Material facts are those that might affect the outcome of the case under the governing law. *Id.* at 248. There is a genuine dispute about a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The moving party bears the initial burden of informing the Court of the basis for the motion and identifying portions of the pleadings, depositions, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the party moving for summary judgment would not bear the ultimate burden of persuasion at trial, it must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden shifts to the nonmoving party to present specific facts showing that there is a genuine issue of material fact for trial. Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

The evidence and all reasonable inferences must be viewed in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Summary judgment thus is not appropriate if the nonmoving party presents

Case Number C 10-1902 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
(JFLC3)

evidence from which a reasonable jury could resolve the material issue in its favor. *Liberty Lobby,* 477 U.S. at 248-49, 106 S.Ct. at 2510; *Barlow v. Ground,* 943 F.2d 1132, 1134-36 (9th Cir. 1991).

### III.  DISCUSSION

**A.     Search Engine Placement**

Defendants first seek a determination that the alleged impact of Fisher-Price's promotion of the iXL Learning System on the way in which major internet search engines display links to Plaintiff's website does not constitute consumer confusion and is not a legally cognizable harm. While Plaintiff's expert initially opined to the contrary, Plaintiff now disclaims any intent to assert an independent theory of harm based upon search engine results, *see* Pl.'s Opposition 12 ("Defendants erroneously contend that Plaintiff's 'primary claim regarding '"harm"' relates to 'allegedly losing its presence in search engine results.'"; "Plaintiff's [deposition] response does not attempt to fully describe the 'harm' associated with Defendants us of Plaintiff's mark, . . . ."). Instead, Plaintiff contends that Defendants' aggressive social networking strategy shows that the products make use of similar "marketing channels," which is a factor in the likelihood-of-confusion analysis. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir.1979), *abrogated in part on other grounds as recognized in Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir.2003) ("Convergent marketing channels increase the likelihood of confusion"). The Court agrees that evidence of the parties' respective internet marketing strategies may be relevant to the question of whether the two products are sold through convergent marketing channels that increase the likelihood of confusion.

Defendants observe correctly that "trademark laws protect against mistaken purchasing decisions, and not against general confusion due to coexistence." *See Walter v. Mattel*, 31 F. Supp. 2d 751, 760 (C.D. Cal. 1998). The mere fact that an internet search engine intermingles links to two products is not evidence of consumer confusion. *See Dahl v. Swift Distrib., Inc.*, No. CV 10-00551 SJO (Rzx), 2010 U.S. Dist. LEXIS 35938, *25 (C.D. Cal. April 1, 2010) (declining "to accept plaintiff's contention that the alleged confusion of the google search engine indicates that consumers are actually confused"). In *Network Automation, Inc. v. Advanced Sys.*

*Concepts*, 638 F.3d 1137 (9th Cir. 2011), the court held that the use of another's trademark as a search engine keyword did not violate the Lanham Act simply because of the possibility that potential customers might be diverted to another site. The court concluded that "because the *sine qua non* of trademark infringement is consumer confusion, . . . the owner of the mark must demonstrate likely confusion, not mere diversion." *Id.* However, while evidence of diversion is not itself evidence of consumer confusion, such evidence may be relevant to trademark infringement analysis. *See Playboy Enters. v. Netscape Communs. Corp.*, 345 F.3d 1020 (examining evidence on "click-throughs" to banner advertisements in examining defendants' intent in selecting the mark).

Plaintiff does not claim that the web presence of Defendants' product "confuses" internet search engines, nor does it contend that Defendants' use of Plaintiff's mark as a keyword search term is itself infringing. Instead, it contends that Defendants' social media campaign places its product in marketing channels similar to those Plaintiff uses to market its own product, thus increasing the likelihood of consumer confusion. Plaintiff presents evidence that Defendants have taken steps such as reserving "tags" to improve search results on Google and Bing; monitoring "Google Blogs Alert for: ixl," sending email "blasts," creating Facebook applications, developing You-tube "channels," and fostering tie-ins with "mommy bloggers." Plaintiff also observes that Fisher-Price has calculated that more than twenty percent of its sales are made over the internet, and that many more consumers research the iXL Learning System using blogs, product reviews, You-Tube videos, Fisher-Price's website, and third-party websites such as Amazon.com.

The Ninth Circuit has observed that "the factor becomes less important when the marketing channel is less obscure." *Network Automation*, 638 F.3d at 1137. The mere existence of online advertising "does not shed much light" on consumer confusion because "it would be the rare commercial retailer that did not advertise online." *Id.* At the same time, the Ninth Circuit has warned district courts to be "acutely aware of excessive rigidity when applying the law in the Internet context; emerging technologies require a flexible approach." *Network Automation*, 638 F.3d at 1137 (quoting *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,

1 174 F.3d 1036, 1054 (9th Cir. 1999).  While purchasing search engine keywords or selling
2 product on Amazon.com are now "ubiquitous marketing channels," social media marketing, such
3 as tie-ins with "mommy bloggers," may be more akin to niche marketplaces such as the specialty
4 retail outlets and trade magazines at issue in *Sleekcraft.* 599 F.2d at 353; *see also Network*
5 *Automation*, 638 F.3d at 1137.  At this stage of the proceedings, the Court cannot conclude that
6 Plaintiff's theories with respect to Defendants' marketing strategies are irrelevant to the issue of
7 consumer confusion.

8 **B.     Monetary relief**

9        Section 35 of the Lanham Act provides that, "subject to the principles of equity," a
10 successful plaintiff shall be entitled to "recover (1) defendant's profits, (2) any damages
11 sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  Defendants seek
12 a determination that Plaintiff is not entitled to monetary relief for actual damages or recovery of
13 Defendants' profits.

14       **1.     Actual Damages**

15       "Trademark remedies are guided by tort law principles."   *Lindy Pen Co. v. Bic Pen*
16 *Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).  Accordingly, damages must be established with
17 reasonable certainty.  *Id.*  If a plaintiff's evidence does not create a triable issue with respect to
18 the damages, summary judgment is appropriate.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at
19 322; *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1103 (D. Ariz. 2006)
20 ("[S]crutiny of plaintiffs' damages evidence is appropriate at the summary judgment stage.").
21 While a plaintiff need not calculate damages with "absolute exactness," it must offer "a
22 reasonable basis for computation" to show that damages are not "remote and speculative." *Lindy*
23 *Pen*, 982 F.2d at 1407-08.

24       Damages in an action for trademark infringement "are typically measured by any direct
25 injury the plaintiff can prove, as well as any lost profits which the plaintiff would have earned
26 but for infringement." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993).
27 However, because proof of actual damages often is difficult, a plaintiff may seek compensation
28 based on other measures, such as the cost of advertising needed to correct public confusion

caused by infringement, *Adray v. Adray-Mart Inc.*, 76 F.3d 984, 988 (9th Cir. 1995), a reasonable royalty for the license of the mark, *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1520 (11th Cir. 1990), or the defendant's profits as an estimate of what plaintiff would have recovered if the defendant had not infringed, *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982).[3]

Plaintiff acknowledges that it is unable to demonstrate lost profits. *See* Conf. Craven Decl., Ex. 3. It nonetheless contends that there is at least a triable issue of fact as to whether it is entitled to compensation for corrective advertising, reasonable royalty, and Defendants' profits as a measure of Plaintiff's lost profits. The Court agrees with Defendants that Plaintiff's evidence is insufficient to create a genuine issue of fact with respect to any of these theories.

**a.     Corrective Advertising**

"An award of the cost of corrective advertising, like compensatory damage awards in general, is intended to make the plaintiff whole. It does so by allowing the plaintiff to recover the cost of advertising undertaken to restore the value plaintiff's trademark has lost due to defendant's infringement." *Adray*, 76 F.3d at 988. A court may award compensation for future advertising that must be undertaken to restore the value of a trademark. *Id.* Where defendants have engaged in misleading advertising, courts have based awards on the Federal Trade Commission's practice of requiring businesses that engage in misleading advertising to spend twenty-five percent of their advertising budget on corrective advertising. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375 (10th Cir. 1977).

A plaintiff need not show a specific measure of harm to its goodwill and reputation in order to recover corrective damages. *Adray*, 76 F.3d at 988 ("Prospective costs may be difficult

---

[3] An accounting of profits may be justified either as a means of compensating the plaintiff for his lost sales in cases involving direct competition between the infringer and the trademark owner, or to prevent the unjust enrichment of the infringing party and deter further infringement. *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir. 1982). The Court will address the availability of Defendants' profits as a means of compensation for lost sales in this section and address the issue of unjust enrichment and deterrence in the next.

Case Number C 10-1902 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
(JFLC3)

to determine precisely and present a danger of overcompensation if they exceed the value of the mark . . . the burden of any uncertainty in the amount of damages should be borne by the wrongdoer.") However, compensatory damages are appropriate only where a plaintiff has shown that in fact it has been injured; it still must present non-speculative evidence that goodwill and reputation–that is, the value of its mark–was damaged in some way. *See Big O Tire Dealers*, 561 F.2d at 1374-76 (concluding that defendant made false statements in its advertising that had a "devastating" impact on plaintiff's mark); *Cher v. Forum Int'l, Ltd.*, 213 U.S.P.Q. (BNA) 96 (C.D. Cal. 1982) (concluding that corrective advertising was reasonable correct the "false, misleading and wrongful advertising using Cher's name and likeness").  Courts have declined to award corrective damages where damage to a mark is merely speculative. *Zazu Designs v. L'Oreal S.A.*, 979 F.2d 499, 506 (7th Cir. 1992) (concluding that plaintiff "did not offer any evidence that consumers (even those who found orange hair revolting) would be less willing to use shampoo tastefully marked under the same name"); *Binder v. Disability Group, Inc.*, 97 U.S.P.Q. 2d (BNA) 1629 (C. D. Cal. 2011) (concluding that the court lacked "any reasonably accurate measure with which to assess an appropriate award of corrective advertising" because "the only known individuals who had negative opinions of plaintiffs as a result of defendants' acts have all had their opinion of plaintiff restored, and there is no indication they harbor any lasting ill-will").

   Here, while it is true that uncertainty as to the *amount* of damages is not fatal to Plaintiff's claim, Plaintiff still has the burden of presenting evidence as to the foundational *fact* that its mark lost value at all.  The only evidence that Plaintiff offers in this regard is its expert report and declaration with respect to the harm it is likely to suffer as a result of its placement in internet search results. Meylan Decl. Ex. AO; Kent Decl. ¶ 3-7.  Plaintiff's expert opines that "harm" occurs each time someone clicks through to a Fisher-Price iXL-related site. Kent Decl. ¶ 5.  He also opines that internet search engine results for 'ixl' by Fisher-Price iXL-related links have forced web users who always would have found Plaintiff's site on major search engines, now may, and likely often do, click on Fisher-Price related links instead. *Id.*

   As noted above, Plaintiff has clarified that it is not seeking damages based on its search

engine results. Pl's. Op. 12. In light of this clarification, its expert opinion fails to offer a non-speculative basis for compensatory corrective damages. The claim that every click-through to a site related to Defendants' product results in measurable or otherwise compensable harm to Plaintiff is based entirely on conjecture. The report cites no evidence that such clicks result from a diversion from Plaintiff's site, much less that such diversion resulted from initial interest confusion and cannot be remedied immediately by the consumer. *See Network Automation*, 638 F.3d at 1152("[R]easonable, prudent and experienced internet consumers are accustomed to . . . exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents."). Finally, even if web traffic has been diverted from its site, Plaintiff has not shown that any underlying or resulting confusion has damaged its goodwill.

  **b. Reasonable Royalty**

  Courts have allowed reasonable royalties as measure of damages in a trademark in trademark infringement cases. *See Tovan Ltd. v. Pfizer, Inc.*, No. CV-98-0094 LGB (MCx), 2000 U.S. Dist. LEXIS 7522, at *51 (C.D. Cal. May 23, 2000) (citing cases). However, lost royalty payments are a form of damages for lost profits, and like other modes of calculating lost profits, they must be proved with reasonable certainty as to both occurrence and extent. *See id.* at *56. Thus, reasonable royalty analysis most often is applied in a trademark context where the parties had a prior licensing arrangement, *see A & H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197 (3d Cir. 1999) (" Even when the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damagse were measured by the license the parties had or contemplated."), or at least where the plaintiff previously had engaged in the practice of licensing the mark to a third-party, *see Sands, Taylor & Wood v. Quaker Oats Co.*, 978 F.2d 947(7th Cir. 1992). Where a plaintiff has failed to present evidence of an intent to license its trademark, a reasonable royalty analysis necessarily is speculation. *Trovan*, 2000 U.S. Dist. LEXIS 7522, at *58; *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 U.S. Dist. LEXIS 65665, at *42 (C.D. Cal. July 28, 2009).

  Plaintiff contends that it has presented evidence of its intent to enter into outbound

10

Case Number C 10-1902 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT
(JFLC3)

licenses and actually has negotiated an outbound license with a major textbook company. Plaintiff's CEO, Mr. Mishkin, testified at his deposition that "licensing [its mark] to other people" is "something that – yes, that we're thinking about," and that "I would say it is very likely that at some point we will license it." Meylan Decl. Ex. AO 126:21-127:4. However, Mr. Mishkin almost immediately qualified that statement by adding, "We don't currently have plans to license it." *Id.* He also indicated that there are no written plans and no timetable for licensing the product. *Id.*

Mr. Mishkin also testified that Plaintiff recently negotiated but postponed a license agreement. However, he acknowledged that the license at issue was for IXL content, not a license for the IXL mark. The proposed term sheet for the license made clear that the license was a classic "white label situation" that would feature the licensee textbook company's brand throughout. Mishkin Decl., ex. F. As such, the negotiations are not relevant to whether Plaintiff intended to license its trademark.

Because the record contains no evidence of a prior license or licensing negotiations between the parties, a prior license or negotiations with respect to Plaintiff's mark with a third party, or of a plan or timeline for licensing the mark, and in light of Mr. Mishkin's admission that the company had no current plans to license its mark, Plaintiff's claim that it "likely" would license its mark "at some point in the future," is insufficient as a matter of law to support a claim for lost profits in the form of a reasonable royalty. The mere possibility of a future license cannot create an issue of fact as to the availability of lost royalties, any more than speculation about the possibility of lost sales can create an issue of fact as to lost profits. *See Lindy Pen,* 982 F.2d at 1407-08; *Trovan*, 2000 U.S. Dist. LEXIS 7522, at *56.

    **c.**    **Defendants' profits as measure of Plaintiff's lost profits**

Where a plaintiff and defendant are in direct competition and the plaintiff is unable to prove its own lost sales, an award of the defendant's profits may serve as proxy for what the plaintiff would have recovered had the defendant not infringed upon or been likely to dilute the plaintiff's mark. *Maier Brewing Co. v. Fleishmann Distilling Corp.*, 390 F.2d 117, 123 (9th Cir. 1968); *Gilson on Trademarks*, § 14.03[6][b] (2011). However, such a rationale for awarding a

defendant's profits is not appropriate where the parties are not direct competitors. *See Maier Brewing*, 390 F.2d at 123. In addition, an award of the defendant's profits is inappropriate in cases of reverse confusion, where the junior user's profits are likely to exceed the senior user's diverted sales. *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 80 (1st Cir. 2008) ("[R]everse confusion does not lend itself to any automatic assumption that there is an equivalence between defendant's profits and plaintiff's diverted sales."). In light of these limitations, it is not surprising that Plaintiff has not presented evidence that it is entitled to an accounting of Defendant's profits as a proxy for its own alleged lost profits. Instead , it relies upon an unjust enrichment rationale, which at most entitles it to equitable relief rather than damages.[4]

### 2.   Award of Defendants' profits to prevent unjust enrichment

An accounting of a defendant's profits may be justified to prevent unjust enrichment and deter further infringement. *Playboy Enterprises*, 692 F.2d at 1272. Where the defendant's profits are sought as a measure of the plaintiff's lost sales, "plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty." *Lindy Pen Co.*, 982 F.2d at 1408. However, when such an accounting is based on a theory of unjust enrichment, the Ninth Circuit "has cautioned that an accounting is proper only where the defendant is attempting to gain the value of an established name of another." *Hydramedia Corp. v. Hydra Media Group Inc.*, 392 Fed. Appx. 522 (9th Cir. 2010) (quoting *Lindy Pen Co.*, 982 F.2d at 1406). "Where trademark infringement is deliberate and willful, a remedy no greater than injunction 'slights' the public," but where the infringement is not willful, "the plaintiff is not entitled to a windfall." *Lindy Pen Co.*, 750 F.2d 918 (internal citations and alterations in the

---

[4] The Supreme Court has held that a plaintiff has a right to a jury trial whenever damages are sought for trademark infringement or unfair competition, even if Plaintiff seeks relief such as "accounting." *Dairy Queen v. Wood*, 369 U.S. 469 (1962). However, the Supreme Court also has characterized disgorgement of improper profits as an equitable remedy. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 346 (1998). Under Ninth Circuit authority, accounting based on unjust enrichment is equitable relief. *See Reebok Int'l v. Marnatch Enters.*, 970 F.2d 552, 559 (9th Cir. 1992) (concluding in the context of an asset freeze order that "an accounting for profits . . . is an equitable remedy subject to the principles of equity"). Because such relief is equitable rather than legal, it does not entitle Plaintiff to a jury trial.

original omitted). Here, Defendants argue that Plaintiff has failed to create an issue of fact as to willfulness.

Plaintiff contends that its evidence raises at least a question of fact as to willfulness. It cites authority holding that in the context of reverse confusion, the junior user's knowledge of the senior user's mark at the time of infringement may establish wilfulness. *See Bellagio Jewelry, Inc. v. Croton Watch Co., Inc.*, No. CV 06-6672, 2008 WL 3905895, at *13 (C.D. Cal. Aug. 20, 2008) ("After receiving the cease and desist letter, [defendant] was put on actual notice, which logically demonstrates that any infringing conduct thereafter was done willfully."); *M2 Software, Inc. v. Madacy Enter.*, No. CV 00-2853, 2003 WL 25667610, at *1 (C.D. Cal. Jan 23, 2003) (concluding that defendant's discovery of plaintiff's mark during its trademark search created a subject of legitimate dispute as to willful infringement for claim of reverse confusion). In this case, Defendants acknowledge that they discovered Plaintiff's IXL mark in their trademark search. Motion at 15. Plaintiff also refers to an email sent by the graphic artist who designed the iXL logo that circulated the URL of Plaintiff's website, as well as the cease-and-desist letter sent by Plaintiff prior to Defedants' release of the iXL Learning System. Finally, Plaintiff points out that Defendants' initial trademark application described their goods and services as: "Children's educational toys and devices, namely handheld learning systems with interactive features; software used in conjunction with children's educational toys and devices." Meylan Decl. ex. P, but that following the cease-and-desist letter, Defendants filed a new application that eliminated references to an educational, learning computer. *Id.*, ex AE.

Defendants contend that any infringement would not have been willful because they "reasonably [could have] thought that [their] proposed usage was not barred by statute," *Blockbuster Video v. City of Tempe*, 141 F.3d 1295, 1300 (9th Cir. 1998). They point out that in *M2 Software, Inc. v. Viacom*, 223 Fed. Appx. 653 (9th Cir. 2007), the court upheld a grant of summary judgment on the issue of willful infringement where the defendant had knowledge of the senior mark but had applied to the USPTO to register its own mark. However, because Plaintiff has proffered at least some evidence contesting the good faith of Defendants' application, the Court cannot conclude as a matter of law that Defendant did not willfully

13

infringe.[5]

## C. Forward Confusion

Defendants next seek summary judgment with respect to forward trademark confusion. The Ninth Circuit has recognized two distinct claims for trademark infringement: forward confusion, which "occurs when consumers believe that the goods bearing the junior mark came from or were sponsored by, the senior mark holder," and reverse confusion, which occurs "when consumers dealing with the senior mark holder believe that they are doing business with the junior one." *Surfvivor Media*, 406 F.3d at 630. While both types of claims depend on a showing of likelihood of consumer confusion, and both are analyzed based on the factors articulated in *Sleekcraft*, 599 F.2d at 348-49, factors such as the strength of the marks, intent of the defendant, and actual confusion are sufficiently different that the claims must be analyzed independently. To survive a motion for summary judgment on its forward confusion claim, Plaintiff must show that there is sufficient evidence to permit a rational trier of fact to find that Plaintiff's product was the source of consumer interest in Fisher-Price's iXL Learning System. *Id.* Such confusion

---

[5] Defendants also contend that Plaintiff is not entitled to an accounting of their profits from the Fisher-Price iXL Learning System for the simple reason that the product has not made a profit. They observe that a "defendant may deduct overhead expenses where he can demonstrate they were of actual assistance in the production, distribution or sale of the infringing product," *Winterland Concessions Co. v. Fenton*, 835 F. Supp. 529, 533 (N.D. Cal. 1993), and they assert contend that after design and development expenses are taken into consideration, the iXL Learning System has yet to make a profit. Plaintiff argues that the period before infringement is irrelevant to the accounting time period.
  Defendants are correct that they may deduct expenses that they can prove were "of actual assistance in the production, distribution or sale of *the infringing products*," without respect to when the expenses were incurred. However, they have not shown the extent to which their design and development costs should be apportioned to the sale of products during the accounting time period. Because an accounting of Defendants' profits based on theories of unjust enrichment and deterring further infringement are equitable remedies and "subject to the principles of equity," 15 U.S.C. § 1117(a), the Court elects to defer judgment on such matters until trial. Even if Defendants's receipts ultimately may not be characterized as "profits," the Court still may be under an equitable obligation to "take all the economic incentive out of trade mark infringement." *See Polo Fashions, Inv. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (concluding that defendant's sales made in an attempt to "unload" his inventory after having been caught infringing were not properly characterized as "profits," but that the receipts could awarded as a disincentive); *see also Lindy Pen Co.*, 982 F.2d at 1405 (an accounting of profits is not automatic and must be granted in light of equitable considerations).

must be shown to be "probable," not merely "possible." *M2 Software, Inc. v. Mandacy Entm't*, 421 F.3d 1073, 1085 (9th Cir. 2005). Although disfavored in trademark infringement cases, summary judgment may be entered when no genuine issue of material fact exists. *Surfvivor*, 406 F.3d at 630.

The Court concludes that while Plaintiff has presented survey evidence tending to show a likelihood of reverse confusion, *see* Meylan Decl. ex. AL, it has failed to present sufficient evidence to permit a rational trier of fact to find that forward confusion is probable. Plaintiff alleges that it received numerous emails, telephone calls, and other inquiries from consumers believing that Plaintiff was associated with the iXL Learning System, Pl.'s Op. at 22, and it offers declarations from its consumer assistance representatives and emails from consumers asking for information about the iXL Learning System, reporting problems with the system, and asking about Plaintiff's affiliation with Fisher-Price, *see id.* (citing *Virgin Enters. Ltd. v. Virgin Petrol., Inc.*, No. CV 99-12826, 2000 U.S. Dist. LEXIS 8100, at *33-34 (C.D. Cal. Jan 19, 2000)).

Defendants object to this evidence on various grounds. However, even assuming that the evidence is admissible, on close examination it does not support a claim for forward confusion. Only two of the emails express any awareness that IXL Learning's services are separate from the Fisher-Price iXL Learning System. *See* Kent Decl., ex. 1 QUIA 132867, QUIA 033613. Both of the emails were for the apparent purpose of informing Plaintiff about the existence of the Fisher-Price product.[6] The remaining emails all appear to be from individuals who *contacted Plaintiff* believing that *Plaintiff* was affiliated with the Fisher-Price product.[7] Several of the emails refer explicitly to the product as a "Fisher Price" device or toy. *See e.g., id.* QUIA33577,

---

[6] Although one of the emails, from a IXL customer who "deal[s] with trademarks at [his] job," indicated that the customer "first thought" that IXL.com "was behind" the Fisher-Price product, the substance of the email was directed towards concern for Plaintiff's legal position rather than an expression of confusion. Kent Decl., ex. 1 QUIA 132867.

[7] Another email, from a student who was "critiquing" Plaintiff's website, inquired about the relationship between IXL Learning and Fisher-Price, but the student did not express confusion as to the source of the iXL product. Kent Decl., ex. 1 QUIA 033602.

1  QUIA033594, QUIA 033615.  Likewise, Plaintiff's evidence that job candidates asked if IXL
2  Learning was affiliated with Fisher-Price, to the extent that it is relevant at all, tends to show
3  *reverse* confusion.  *See* Blatnik Decl.; Davis Decl.; Stedner Decl.  Plaintiff offers no evidence
4  supporting a claim that any customers purchased the Fisher-Price product based on a mistaken
5  belief that it was affiliated with IXL Learning's web-based products.

6  **D.    Cancellation of Plaintiff's IXL Registration**

7  Under 15 U.S.C. § 1119, a court may order cancellation of a trademark registration,
8  either in whole or in part.  Section 1 of the Lanham Act requires that a trademark must be "used
9  in commerce" in order to be registered.  *See* 15 U.S.C. § 1051.  An applicant "may not file a
10 statement of use until the applicant has made use of the mark in commerce on or in connection
11 with all goods/services specified in the notice of allowance, unless the applicant files a request to
12 divide."  T.M.P.E. § 1109.03; *see* 37 C.F.R. § 2.88(c).  "The registration of a mark that does not
13 meet the use requirement is void ab initio."  *Id.*  Where there has been no showing of fraud,  a
14 registration may be cancelled in part to remove services on which the registrant had not used the
15 mark at the time of the application.  *Grand Canyon West Ranch LLC v. Hualapi Tribe*, 78
16 U.S.P.Q.2d 1696 (T.T.A.B. 1985).

17 The statement of use for Plaintiff's trademark, U.S. Registration No. 3596291, identifies
18 the uses as "[e]ducational services, namely, online instruction in the fields of math, science,
19 English and foreign languages for use in the K-12 education market."  Defendants seek partial
20 cancellation of this trademark on the basis that Plaintiff overstated its use of the IXL mark.[8]

21 Plaintiff contends that although its service focuses on math, it provides coverage of
22 related topics in English/language arts and science.  Mishkin Decl. ¶ 4.  Plaintiff's CEO states
23 that the math instruction provided on IXL.com provides a secondary benefit of improved
24 reading, and that because the service instructs students whose native language is other than
25 English, it assists in the study of "foreign languages" as well.  Craven Decl., ex. 1 62-63.  He
26 also states that the product "touches on" science in the areas of statistics and reading

27
28         [8] Defendants do not seek summary judgment on the issue of fraud.  Mot. At 6.

16

1 measurements. *Id.*, ex. 1 64.

2 Plaintiff's "inclusive interpretation" of its product, *see* Craven Decl. ex. 11 ¶ 46, is insufficient to create an issue of fact as to whether it engaged in the use in commerce of service of English, science, or foreign language instruction. Plaintiff contends that a good faith belief that its representations were accurate is sufficient. However, "intent is not an element of a claim that a mark was not used on certain of the identified goods or services." *Adidas Am., Inc. v. Calese*, 08-CV-91-BR, 2010 U.S. Dist. LEXIS 123386, at *6 (D. Or. Nov. 19, 2010). Plaintiff has not presented evidence supporting its claim that English, science, or foreign language services ever were offered on its site. While it may be true that instruction in different courses can be mutually reinforcing, instruction in one subject is not necessarily instruction in another. Accordingly, the Court concludes that Plaintiff has not met the use-in-commerce requirement as to online instruction in the fields of English, science, and foreign languages.

### IV. CONCLUSION

Good cause appearing, the motion is granted in part and denied in part as set forth above. As only claims for equitable relief remain, the remaining claims shall proceed to trial without a jury.

IT IS SO ORDERED.

DATED: July 14, 2011

_____
JEREMY FOGEL
United States District Judge